

**Dated: March 29, 2018.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 16-10300-TMD |
| | § | |
| WESTECH CAPITAL CORP. | § | CHAPTER 7 |
|     Debtor. | § | |

---

| | | |
|---|---|---|
| GREGORY S. MILLIGAN, | § | |
| CHAPTER 7 TRUSTEE, | § | |
|     Plaintiff, | § | |
| | § | ADV. NO. 16-01078-TMD |
| v. | § | |
| | § | |
| GARY SALAMONE; GREENBERG | § | |
| TRAURIG, LLP; ROBERT W. HALDER | § | |
|     Defendants. | § | |

### <u>MEMORANDUM OPINION</u>

Two factions fought for control of Westech. That control fight was ultimately resolved by the Delaware Supreme Court in 2014. This suit challenges actions taken by two of the incumbent directors, and their lawyer, while the control battle was raging.

John Gorman, IV was on one side of the battle. He was (1) the majority owner of Westech common stock and of the total voting shares, (2) one of the founders of Westech, and

(3) chair of its board from 1999 until his resignation in August 2013. On the other side of the control battle were Gary Salamone, who became Westech's CEO in 2013, and other directors, including Robert Halder and Mike Dura.[1]

After Gorman resigned from the board, he filed the first of a series of lawsuits in which he sought to confirm that he could remove and designate directors of the Westech board. In May 2014, the Delaware Chancery Court issued an opinion partially agreeing with Gorman, but this decision resulted in a deadlocked board. The case was appealed to the Delaware Supreme Court, which ultimately reversed the Chancery Court and left the incumbent directors in control of Westech.

So why are we here? Less than two years later, a shareholder derivative action was filed in Delaware alleging misconduct, during the control fight, by Salamone, Halder, and Westech's counsel. A few months later, Westech filed for bankruptcy. The derivative action was then removed from state court to federal bankruptcy court, and became this adversary proceeding. This case is now being pursued by the Chapter 7 Trustee for the benefit of Westech's creditors.

Greenberg Traurig, LLP served as counsel for Westech at the relevant times. It asks for an order dismissing it from this adversary proceeding.

## I.    FACTS[2]

### A.  **Prelude to the Control Fight**

Westech was a holding company that owned a financial services and brokerage firm called Tejas. In 2011, Westech decided to raise money by issuing a series of preferred stock.[3]

---

[1] The Salamone-aligned directors are called the "incumbent directors."

[2] These are drawn from the complaint; all well-pleaded facts are accepted as true and all facts are viewed in the "light most favorable to plaintiff." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal citation omitted).

[3] Third Am. Compl. ¶20, ECF No. 97.

The preferred stock investors, who included Halder and Gorman, entered into a voting agreement.[4] Darrell Windham, an attorney, represented Westech when it issued the shares and negotiated the voting agreement.[5]

The voting agreement was designed to give the preferred stock investors the right to "designate the election of certain members of" the Westech board.[6] A pleading filed in Delaware court stated that the purpose of the agreement was to "replace Gorman's one-man rule with a 'triumvirate' of Halder [who represented employees], Fellus [who represented management as CEO], and Gorman, which would reportedly encourage compromise."[7] In reality, the voting agreement became the focus of the litigation for control of Westech.

The voting agreement created a new board of directors consisting of Gorman (chair), Halder, and James Fellus. Halder became President and COO of Westech and entered into a three-year employment agreement in October 2011.[8] Fellus became the CEO and signed a $1,000,000 promissory note to Westech to pay for his preferred stock.[9]

When Fellus's note became due, he refused to pay.[10] As a result, he was terminated as CEO and removed from the board "for cause."[11] Fellus disputed that cause existed and began a FINRA arbitration proceeding that resulted in an arbitration award of almost $1.1 million in favor of Westech against Fellus.[12] Westech did nothing to confirm the award.[13] The

---

[4] Third Am. Compl. ¶21, ECF No. 97.
[5] Third Am. Compl. ¶22, ECF No. 97. Windham was then with Fulbright & Jaworski LLP but later moved to Greenberg Traurig, taking Westech, his client, with him. Third Am. Compl. ¶22, ECF No. 97.
[6] Third Am. Compl., Ex. A at 1, ECF No. 97.
[7] *Salamone v. Gorman*, 106 A.3d 354, 362 (Del. 2014).
[8] Third Am. Compl. ¶¶23, 26, ECF No. 97.
[9] Third Am. Compl. ¶99, ECF No. 97.
[10] Third Am. Compl. ¶99, ECF No. 97.
[11] Third Am. Compl. ¶99, ECF No. 97.
[12] Third Am. Compl. ¶¶100-01, ECF No. 97.
[13] Third Am. Compl. ¶102, ECF No. 97.

enforceability of the award is the subject of another adversary here.[14]

After Fellus was ousted, Gary Salamone became the new CEO and joined Westech's board.[15] He entered into an employment agreement that expired on September 30, 2014.[16]

### B.  <u>Gorman Tries to Retake Control</u>

After resigning from his positions at Westech and Tejas, Gorman purported to remove Halder and Dura and appoint himself, Greg Woodby, Barry Williamson, Barry A. Sanditen, Daniel Olsen, and T.J. Ford as directors. Mr. Gorman believed he had the right to do this based on the voting rights agreement.[17] He then filed a section 225 action[18] in the Delaware Court of Chancery seeking a judgment that, by his purported unilateral removals and appointments, he had retaken control of Westech.[19] Halder filed his own section 225 lawsuit in opposition to Gorman the same day.[20] Greenberg represented Westech and the incumbent directors in the suit.[21] The Delaware court consolidated these proceedings into one, and it became the first of several Delaware suits all related to the control fight.[22]

In this consolidated proceeding, the Delaware court issued a status quo order naming Salamone, Dura, and Halder as directors and limiting the authority of the board.[23] Before the status quo order was entered, Greenberg and the Westech board caused Westech to pay a $50,000 retainer to Greenberg.[24] During the first section 225 action, Greenberg, on behalf of the

---

[14] *Milligan v. Fellus*, Ch. 7 Case No. 16-10300, Adv. No. 16-01084 (Bankr. W.D. Tex.).
[15] Third Am. Compl. ¶29, ECF No. 97.
[16] Third Am. Compl. ¶29, ECF No. 97.
[17] *Salamone*, 106 A.3d at 362-63.
[18] Section 225 of the Delaware General Corporation Law gives the Court of Chancery the ability to hear challenges to issues of board membership. DEL. CODE ANN. tit. 8, § 225 (Westlaw through 81 Laws 2017 (excluding chs. 1-199 Revisions to the 2017 Acts by the Delaware Code Revisors)).
[19] Third Am. Compl. ¶31, ECF No. 97.
[20] Third Am. Compl. ¶31, ECF No. 97.
[21] Third Am. Compl. ¶31, ECF No. 97.
[22] Third Am. Compl. ¶31, ECF No. 97.
[23] Third Am. Compl. ¶¶33-34, ECF No. 97.
[24] Third Am. Compl. ¶36, ECF No. 97.

incumbent directors, filed motions to pay bonuses, commissions, and the legal expenses of Halder, Salamone, and Dura.[25]

### C. **The Halder Cancellation Agreement**

Halder's employment agreement would have automatically renewed unless a notice of non-renewal was given by June 2, 2014.[26] If it was not renewed, as long as Halder honored the agreement's covenants, including a covenant not to compete, and signed a release, he would be entitled to:

1. Accrued Obligations,[27]
2. A year's salary ($180,000),
3. Certain bonus payments (at minimum, $300,000),
4. Insurance benefits for a year, and
5. All unvested stock would vest.[28]

Gorman requested that Westech send notice of non-renewal to Halder before the June 2 deadline, and moved to prevent renewal.[29] The incumbent directors wrote letters to the Delaware court asserting that the employment agreement would not be renewed, and noting that a notice of non-renewal was not due until June 2.[30] The Court scheduled a teleconference for the afternoon of May 29 to address Halder's employment agreement.[31]

Just hours before the scheduled conference call, the Delaware court issued its opinion on the first 225 suit, ruling that Gorman had successfully removed Halder from the board and appointed himself and Ford onto the board.[32] This resulted in a deadlocked board: Salamone and

---

[25] Third Am. Compl. ¶36, ECF No. 97.
[26] Third Am. Compl. ¶26, ECF No. 97.
[27] "Accrued Obligations" are defined as all accrued but unpaid salary, bonus payments, and reimbursement of authorized expenses. Third Am. Compl., Ex. B, § 6.
[28] Third Am. Compl., Ex. B, § 6(c).
[29] Third Am. Compl. ¶39, ECF No. 97.
[30] Third Am. Compl. ¶40, ECF No. 97; Third Am. Compl., Exs. I, J, ECF No. 97.
[31] Third Am. Compl. ¶40, ECF No. 97.
[32] Third Am. Compl. ¶41, ECF No. 97; *In re Westech Capital Corp.*, No. 8845-VCN, 2014 WL 2211612, at *20 (Del.Ch. May 29, 2014).

Dura on one side, and Gorman and Ford on the other.[33] Apparently unaware that its ruling deadlocked the board, the Delaware court cancelled the conference call, believing that the call was no longer needed.[34]

The next day, Salamone, on behalf of Westech, entered into an agreement with Halder that, among other things, cancelled the Halder employment agreement.[35] Greenberg drafted this cancellation agreement on the evening of May 29, and it was signed on May 30.[36] The agreement admitted that Westech breached its employment agreement with Halder and terminated the agreement except for Accrued Obligations owed to Halder.[37] This meant that Halder was no longer bound by the noncompete and nonsolicitation covenants. It also meant that Halder waived his right to one year's salary ($180,000), a year's worth of quarterly bonus payments (at least $300,000), and certain insurance benefits. The difference between non-renewing the Halder employment agreement, and cancelling it on the terms agreed to, can be depicted as follows:

| Non-Renewal under Halder's Employment Agreement | |
| --- | --- |
| **Owed to Halder** | **Owed to Westech** |
| Accrued Obligations | Nonsolicitation covenant |
| Base salary ($180,000) | Noncompetition covenant |
| Quarterly Bonus Payments (at least $300,000) | Confidential information covenant |
| Quarterly Special Payments (subject to company action) | Waiver and release of claims |
| Unvested stocks vest | |
| Health, dental, and medical insurance | |

---

[33] Third Am. Compl. ¶41, ECF No. 97; *In re Westech Capital Corp.*, No. 8845-VCN, 2014 WL 2211612, at *20 (Del.Ch. May 29, 2014).
[34] Third Am. Compl. ¶41, ECF No. 97.
[35] Third Am. Compl. ¶¶42-43, ECF No. 97.
[36] Third Am. Compl. ¶42, ECF No. 97.
[37] Third Am. Compl. ¶¶44-45, ECF No. 97; Third Am. Compl., Ex. K, ECF No. 97.

| Cancellation Agreement | |
|---|---|
| **Owed to Halder** | **Owed to Westech** |
| Accrued Obligations | ~~Nonsolicitation covenant~~ |
| ~~Base salary ($180,000)~~ | ~~Noncompetition covenant~~ |
| ~~Quarterly Bonus Payments (at least $300,000)~~ | ~~Confidential information covenant~~ |
| ~~Quarterly Special Payments (subject to company action)~~ | ~~Waiver and release of claims~~ |
| ~~Unvested stocks vest~~ | |
| ~~Health, dental, and medical insurance~~ | |

According to the Trustee's math, though, Halder at that point had been overpaid by $279,000,[38] which would still mean that he waived the right to collect $480,000 minus $279,000, or $201,000. The cancellation agreement was not approved by the board.[39]

The Delaware court held a teleconference in the afternoon the day it learned of the cancellation agreement.[40] Greenberg contended that the agreement was the only way not to renew.[41] The court discussed the possibility that the cancellation agreement violated its status quo order, but made no final decision on the matter.[42] The court did state that "in the event the cancellation does not . . . resolve the ongoing area of concern, then the board's authority -- and this would be an amplification of the status quo order -- to terminate or extend Mr. Halder's employment contract, and that would include non-renewal, is suspended for a period of 60 days until July 30th, 2014."[43] The Delaware court eventually entered an Order and Final Judgment vacating its status quo order, but retaining jurisdiction over disputes on "any application regarding conduct when the Status Quo Order was in effect."[44]

---

[38] Third Am. Compl. ¶81, ECF No. 97.
[39] Third Am. Compl. ¶46, ECF No. 97.
[40] Third Am. Compl. ¶47, ECF No. 97
[41] Third Am. Compl., Ex. L at 8:17-12:4, ECF No. 97.
[42] Third Am. Compl., Ex. L at 6:17-7:6, ECF No. 97.
[43] Third Am. Compl. ¶49, ECF No. 97; Third Am. Compl., Ex. L at 30:13-22, ECF No. 97.
[44] Third Am. Compl. ¶50, ECF No. 97.

A timeline of some of these events is

| Date | Event |
|---|---|
| May 14, 2014 | Gorman moves to prevent renewal of Halder's employment agreement. |
| May 29, 2014 | Delaware Chancery Court issues an opinion that deadlocks the board. |
| May 29, 2014 | Greenberg drafts the cancellation agreement. |
| May 30, 2014 | Halder and Salamone execute the cancellation agreement. |
| May 30, 2014 | Delaware Chancery Court holds a teleconference about the cancellation agreement and Gorman's motion. |
| June 2, 2014 | Deadline for non-renewal of Halder's employment agreement. |

One month after the cancellation agreement was signed, Halder resigned from all positions he held with Westech and Tejas.[45] He then started to work for a Tejas competitor.[46] Halder also solicited other Tejas employees to join him in working for the Tejas competitor.[47]

Later that year, Halder filed a Texas state court lawsuit to determine the validity of the cancellation agreement and Accrued Obligations owed to him by Westech.[48] Westech refused to defend the suit.[49] Gorman asked the Court of Chancery to order Westech to respond to the Halder complaint.[50] In response, that court ordered Westech to seek a stay until it could determine the proper composition of the Westech board.[51] Westech complied, so the Halder action was stayed in November 2014.[52] In 2015, when Halder was back on the Westech board, Halder filed a summary judgment motion.[53] Westech did not defend Halder's motion, and this resulted in an interlocutory order partially granting Halder's motion and finding that Westech

---

[45] Third Am. Compl. ¶52, ECF No. 97.
[46] Third Am. Compl. ¶56, ECF No. 97.
[47] Third Am. Compl. ¶56, ECF No. 97.
[48] Third Am. Compl. ¶64, ECF No 97
[49] Third Am. Compl. ¶67, ECF No 97
[50] Third Am. Compl. ¶67, ECF No. 97.
[51] Third Am. Compl. ¶68, ECF No. 97.
[52] Third Am. Compl. ¶68, ECF No. 97.
[53] Third Am. Compl. ¶¶109, 205(b), ECF No. 97.

was liable to Halder in the amount of $169,598.[54] The action remains unresolved.[55]

### D.  **More Lawsuits**

While the dispute related to the cancellation agreement was ongoing, the control fight continued elsewhere. Following Halder's departure from Westech, Halder, and other employees and stockholders, represented by Greenberg, filed a suit seeking the appointment of a custodian to address the board's deadlock.[56] Greenberg eventually withdrew from representing the plaintiffs, except Michael Wolf and John Randolph.[57] This suit was later voluntarily dismissed by the plaintiffs.[58]

Around this same time, Gorman tried to remove and replace Salamone as CEO by purporting to change Westech's bylaws.[59] The purported changes would allow Gorman to replace Salamone on the board and as CEO, and allow Craig Biddle to take Gorman's seat on the board.[60] Based on this, Gorman asserted that the Westech board consisted of Gorman, Ford, Biddle, and Dura.[61] Three days later, Salamone and other shareholders filed a second section 225 lawsuit in Delaware to determine whether Gorman's latest attempt to control the company was valid.[62] Greenberg represented Salamone, Halder, and others at the beginning of the suit.[63]

Gorman and Biddle proposed a status quo order in this second section 225 suit that would prevent Halder from continuing to compete with Westech.[64] Greenberg, representing Halder,

---

[54] Third Am. Compl. ¶¶109, 191(b), ECF No. 97.
[55] Third Am. Compl. ¶68, ECF No. 97.
[56] Third Am. Compl. ¶53, ECF No. 97.
[57] Third Am. Compl. ¶63, ECF No. 97
[58] Third Am. Compl. ¶63, ECF No. 97.
[59] Third Am. Compl. ¶54, ECF No. 97.
[60] Third Am. Compl. ¶54, ECF No. 97.
[61] Third Am. Compl. ¶54, ECF No. 97.
[62] Third Am. Compl. ¶55, ECF No. 97.
[63] Third Am. Compl. ¶55, ECF No. 97.
[64] Third Am. Compl. ¶57, ECF No. 97.

Salamone, and other employees and stockholders, opposed this language.[65] Greenberg also advised the Delaware court that Halder and other plaintiffs no longer working for Westech and Tejas would retain new counsel. [66] Greenberg later withdrew from representing those parties.[67]

The status quo order entered by the Delaware court kept Salamone, Dura, Ford, and Gorman as directors.[68] It also extended the suspension of the Westech board's authority to terminate or extend the Halder employment agreement until the later of October 30, 2014 or thirty days after the second status quo order was vacated.[69] To date, the order has not been vacated though the suit was voluntarily dismissed in August 2014.[70]

On December 20, 2014, the Delaware Supreme Court rendered an opinion on the first 225 action and ruled that Halder was not removed from the board.[71] Thus, Halder, Dura, Salamone, Gorman, and Ford were the Westech directors.[72]

Meanwhile, in September 2014, Gorman filed a third section 225 lawsuit in Delaware.[73] On July 31, 2015, the Delaware Chancery Court issued an opinion on Halder and Salamone's motion to dismiss the third 225 action.[74] The court ruled that Salamone was still CEO, dismissing that part of the complaint, and found that fact issues remained about whether Halder had resigned from the board.[75] Gorman eventually withdrew this suit.[76]

---

[65] Third Am. Compl. ¶58, ECF No. 97.
[66] Third Am. Compl. ¶59, ECF No. 97.
[67] Third Am. Compl. ¶63, ECF No. 97.
[68] Third Am. Compl. ¶62, ECF No. 97.
[69] Third Am. Compl. ¶62, ECF No. 97.
[70] Third Am. Compl. ¶¶62-63, ECF No. 97; Third Am. Compl., Ex. P ¶4, ECF No. 97.
[71] Third Am. Compl. ¶69, ECF No. 97.
[72] Third Am. Compl. ¶69, ECF No. 97.
[73] Third Am. Compl. ¶65, ECF No. 97.
[74] Third Am. Compl. ¶71, ECF No. 97; *Gorman v. Salamone*, No. 10183-VCN, 2015 WL 4719681 (Del. Ch. July 31, 2015).
[75] Third Am. Compl. ¶71, ECF No. 97; *Gorman*, 2015 WL 4719681, at *6-7.
[76] Third Am. Compl. ¶71, ECF No. 97.

## II.   ANALYSIS

The Trustee alleges that Greenberg (1) breached its fiduciary duties to Westech;[77] (2) had a conflict of interest or was negligent by representing clients with adverse interests;[78] and (3) aided and abetted breaches of fiduciary duty by Salamone and Halder.[79] The Trustee seeks disgorgement of the fees charged to Westech and Tejas[80] and equitable subordination of Greenberg's claim.[81]

### A.   The Complaint Fails to Plausibly Plead a Breach of Fiduciary Duty Claim

Under both Delaware and Texas law, allegations that amount to no more than legal malpractice claims cannot support a breach of fiduciary duty claim.[82] "Admittedly, Delaware courts have . . . colloquially referred to attorneys as 'fiduciaries.' But, the cases evaluating attorney conduct in terms of breach of fiduciary duty generally involve an attorney acting in some capacity beyond the mere provision of legal services that raised fiduciary concerns."[83] Likewise under Texas law, "a plaintiff [may not] divide or fracture her legal malpractice claims into additional causes of action."[84] Thus, under the laws of both states, to support the Trustee's claim of breach of fiduciary duty, the complaint had to address conduct by Greenberg that was something other than providing legal services.[85]

So what has the Trustee alleged that goes beyond a malpractice claim? In his brief, the

---

[77] Third Am. Compl. ¶¶155-57, ECF No. 97.

[78] Third Am. Compl. ¶¶174-76, ECF No. 97.

[79] Third Am. Compl. ¶¶170-72, ECF No. 97.

[80] Third Am. Compl. ¶¶177-79, ECF No. 97.

[81] Third Am. Compl. ¶¶223-26, ECF No. 97.

[82] *Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, CIV.A. 3874-VCS, 2009 WL 2501542, at *4 (Del. Ch. Aug. 5, 2009); *Goffney v. Rabson*, 56 S.W.3d 186, 193-94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

[83] *Sokol Holdings*, 2009 WL 2501542, at *4.

[84] *Goffney*, 56 S.W.3d at 190. To support a separate breach of fiduciary claim, "self-dealing, deception, or misrepresentations" are required. *Id.* at 194.

[85] For instance, in *Goffney*, the court stated that "[b]reach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations." *Id.* at 193.

Trustee lists several allegations that he argues go beyond malpractice claims.[86] But, with two exceptions, all of these allegations relate to the supposed conflicting representation engaged in by Greenberg, and, as discussed below, the Complaint does not adequately plead any actual conflicts of interest. The two exceptions relate to fees paid to Greenberg by Westech or Tejas, and the $50,000 retainer paid to Greenberg. Both are transactions ordinarily part of the attorney-client relationship. And the Complaint never alleges that Greenberg did not earn the fees paid. While Westech paid the retainer "without prior notice to the Court of Chancery or opposing counsel,"[87] the Complaint does not explain why this notice was required.

The Trustee also argues that Greenberg "improperly exercised control over Westech's property"[88] in obtaining a retainer and in seeking relief from the status quo orders to pay salaries and commissions. Simply put, this is implausible. One would have to infer that Greenberg had control over the account from which the $50,000 payment was made, which is too unlikely. As well, one would have to infer that Greenberg wrote letters to the Vice Chancellor, and filed pleadings with the Court of Chancery, with no direction from the client, also unlikely.

In short, all the actions taken by Greenberg as alleged by the Trustee were actions taken in the context of the attorney-client relationship, and no more, and so the Trustee has not alleged a cognizable claim for breach of fiduciary duty on the part of Greenberg.

### B.  The Complaint Fails to Plausibly Plead a Conflict of Interest

The Trustee also alleges that Greenberg committed malpractice by concurrently representing both Westech and its incumbent directors.[89] Yet under both Texas and Delaware

---

[86] Pl's Answering Br. in Opposition to Greenberg Traurig, LLP's Mot. to Dismiss the Trustee's Second Am. Compl. 7-8, ECF No. 98.
[87] Third Am. Compl. ¶88, ECF No. 97.
[88] Third Am. Compl. ¶86, ECF No. 97.
[89] Third Am. Compl. ¶¶150-76, ECF No. 97.

law, one or both of which apply here, a lawyer may represent two clients concurrently as long as the relevant interests of the two clients are aligned.[90]

Greenberg was representing Westech generally when Gorman took the actions that began the long control litigation.[91] Salamone, Halder, and Dura were Westech's incumbent directors, and would remain so until the control litigation was resolved.[92] So their interests in the control litigation were aligned with those of Westech. And the Complaint contains no allegations explaining why or how those interests were not aligned.

The Trustee cites *In re Salazar*[93] and *Opdyke v. Kent Liquor Mart, Inc.*[94] to support his position that Greenberg's representation of the incumbent directors and Westech was an impermissible conflict.[95] But the facts of the *Salazar* and *Brown* cases are only superficially similar to the facts here. In *Salazar*, a lawyer was representing one faction in a fight over control of a church, and the court of appeals upheld a trial court determination that the lawyer lacked the authority to represent the corporate entity that owned the church.[96] Here, there is no allegation that Greenberg lacked authority to represent Westech. In *Opdyke*, the lawyer represented all three of the individuals who formed a venture, and then the attorney bought out one of the

---

[90] DEL. LAWYERS' R. PROF. CONDUCT R. 1.7 ("[A] lawyer shall not represent a client if the representation . . . of one client will be directly adverse to another client [or] there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . ."); *Id.* at R. 1.13(e) ("A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7."); TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.06(b) ("[A] lawyer shall not represent a person if the representation of that person: (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client . . . .").

[91] Third Am. Compl. ¶¶22, 36, ECF No. 97.

[92] Third Am. Compl. ¶¶33, 69, ECF No. 97.

[93] *In re Salazar*, 315 S.W.3d 279 (Tex. App.—Fort Worth 2010, orig. proceeding).

[94] *Opdyke v. Kent Liquor Mart, Inc.*, 181 A. 2d 579 (Del. 1962).

[95] Pl's Answering Br. in Opposition to Greenberg Traurig, LLP's Mot. to Dismiss the Trustee's Second Am. Compl. 5-6, 11, ECF No. 98.

[96] *In re Salazar*, 315 S.W.3d at 283, 285-6.

individuals.[97] Greenberg started out representing Westech, and there are no allegations that Greenberg acquired any Westech stock.

And there's more. The Complaint simply alleges no facts that describe a conflict between Westech and the incumbent directors so far as the control litigation is concerned. Instead, the Trustee simply asserts that Greenberg took "positions directly adverse to Westech,"[98] and that "Greenberg's representation of Westech was riddled with conflicts."[99] To support this assertion, the Trustee lists times when Greenberg tried to secure a retainer, and in which Greenberg sought to obtain relief from the status quo order to pay bonuses and commissions.[100] Even so, the Complaint alleges no facts that would support an inference that it was improper for Greenberg to receive a retainer to secure payment of its fees, nor any facts that would support an inference that the salary and bonuses were not contractually required or, for that matter, otherwise improper.

The Trustee also alleges that Greenberg should have advised Westech to obtain separate counsel for the cancellation agreement[101] based on a supposed conflict of interest, but does not identify the conflict. Again, the Complaint alleges only that Greenberg represented Halder in his capacity as an incumbent director,[102] but contains no allegation that there is a conflict between the incumbent directors in their role as such, and Westech. Indeed, no such allegations could be alleged as there is no conflict. The underlying issue is whether Gorman and his faction had the authority under the voting agreement to, among other things, remove Halder from the board. On this issue, the interests of the incumbent directors were by definition aligned with the interests of Westech.

---

[97] *Opdyke v. Kent Liquor Mart, Inc.*, 181 A. 2d 579, 581-84 (Del. 1962).
[98] Third Am. Compl. ¶36, ECF No. 97.
[99] Pl's Answering Br. in Opposition to Greenberg Traurig, LLP's Mot. to Dismiss the Trustee's Second Am. Compl. 13, ECF No. 98.
[100] Third Am. Compl. ¶36, ECF No. 97.
[101] Third Am. Compl. ¶48, ECF No. 97.
[102] Third Am. Compl. ¶35, ECF No. 97.

The Trustee next alleges that Greenberg's opposition to Gorman's status quo order in the second 225 action was improper.[103] The proposed status quo order would have prevented Halder from competing with Westech, effectively reinstating the covenant not to compete.[104] The Trustee also argues Greenberg should have sued to enforce the noncompete and nonsolicitation covenants of Halder's employment agreement.[105] But the positions taken by Greenberg on behalf of its client, Westech, were consistent with the cancellation agreement. The only logical inference is that Westech would want its counsel to honor an agreement that it executed, and there is nothing alleged to the contrary.[106] As a result, there is also no conflict alleged on these points.

Most implausible of all is the bare allegation that Greenberg's efforts to obtain a custodian, after the Court of Chancery left Westech with a conflicted board, represented another direct conflict of interest.[107] Because the Delaware court left the board equally divided between two competing factions, and given the continuing acrimony between the two factions, seeking the appointment of a custodian seems like the most sensible step taken by any of the parties during this bitter dispute. And, in fact, the Complaint contains no allegations from which to infer why this "constituted" a conflict of interest, or even why it was not a good idea.

In arguing the malpractice issue, the Trustee's brief relies only on the alleged conflicts of interest just discussed, and the cancellation agreement allegations and related allegations, which will be discussed next. Finally, the Trustee also relies on a handful of conclusory allegations in

---

[103] Third Am. Compl. ¶58, ECF No. 97.
[104] Third Am. Compl. ¶57, ECF No. 97.
[105] Third Am. Compl. ¶61, ECF No. 97.
[106] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").
[107] Third Am. Compl. ¶53, ECF No. 97.

paragraph 175; but does not explain anywhere why the actions complained of constitute malpractice.[108]

## C.  Aiding and Abetting: The Cancellation Agreement

Texas and Delaware law on aiding and abetting differ slightly.

### 1.  Delaware Law on Aiding and Abetting

Under Delaware law, the elements of aiding and abetting a breach of fiduciary duty are

    a.  The existence of a fiduciary relationship;
    b.  Breach of the fiduciary's duty;
    c.  Knowing participation in that breach by the defendants; and
    d.  Damages proximately caused by the breach.[109]

The only element contested by Greenberg is that of knowing participation.[110] The Delaware Supreme Court has explained that "knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes a breach."[111] The level of knowledge required is "knowingly, intentionally, or with reckless indifference" or an "illicit state of mind" and that the third party "had 'actual or constructive knowledge that their conduct was legally improper.'"[112] Knowledge need not be plead with particularity and it may be inferred.[113] That said, sufficient factual allegations are necessary to survive a motion to dismiss.[114]

In *Zazzali v. Fischer*, a trustee in a bankruptcy case filed a claim for aiding and abetting against counsel for debtors who ran a Ponzi scheme.[115] The District Court, applying Delaware

---

[108] Third Am. Compl. ¶175, ECF No. 97.
[109] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).
[110] Greenberg Traurig, LLP's Mem. In Support of Mot. to Dismiss the Trustee's Second Am. Compl. 8-11, ECF No. 85.
[111] *Malpiede*, 781 A.2d at 1097.
[112] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015).
[113] *In re Telecomms., Inc. S'holders Litig.*, No. Civ.A 16470-NC, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003).
[114] *Id.* at *2.
[115] *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 504-05 (D. Del. 2012).

law, held that the debtors did not adequately plead knowing participation because the allegations were merely that "Defendant provided legal services that were common in the industry."[116] The court thus dismissed the aiding and abetting claims for failure to state a claim.[117]

## 2. <u>Texas Law on Aiding and Abetting</u>

Under Texas law, aiding and abetting a breach of fiduciary duty is more often called knowing participation in a breach of fiduciary duty.[118] But the Texas Supreme Court has not expressly decided that this cause of action exists.[119] In *First United Pentecostal Church of Beaumont v. Parker,* the Texas Supreme Court stated that if a claim for aiding and abetting a breach of fiduciary duty did exist, the plaintiff would have to prove "that the defendant, with unlawful intent, substantially assisted and encouraged a tortfeasor in a wrongful act that harmed the plaintiff."[120] In an earlier case, *Juhl v. Airington*, the Texas Supreme Court explained that whether substantial assistance was provided can be evaluated by considering these factors:

a. The nature of the wrongful act;
b. The kind and amount of the assistance;
c. The relation of the defendant and the actor;
d. The presence or absence of the defendant at the occurrence of the wrongful act; and
e. The defendant's state of mind.[121]

The scienter elements are like the requirement in Delaware law in that it requires both

---

[116] *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 519 (D. Del. 2012).

[117] *Id.*

[118] *The Official Comm. of Unsecured Creditors of Schlotzsky's, Inc. v. Grant Thornton, L.L.P. (In re Schlotzsky's Inc)*, 351 B.R. 430, 439 (Bankr. W.D. Tex. 2006).

[119] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2016). *But see Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It is settled law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."). Citing other Texas cases, the Fifth Circuit has recognized a cause of action for knowing participation in a breach of fiduciary duty with elements that are almost identical to Delaware's cause of action for aiding and abetting. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).

[120] *First United Pentecostal Church*, 514 S.W.3d at 224-25 (analyzing the claim of aiding and abetting while assuming, but not deciding that such a claim exists).

[121] *Juhl v. Airington*, 936 S.W.2d 644-45 (Tex. 1996); *see also First United Pentecostal Church*, 514 S.W.3d at 225 (citing the *Juhl* factors in its analysis of a claim for aiding and abetting a breach of fiduciary duty).

knowledge of the fiduciary relationship and knowledge of the breach.[122] Even though Texas law was not discussed by either the Trustee or Greenberg, based on the arguments presented in the pleadings, the only element brought into question by Greenberg is whether Greenberg knew that it was participating in breaches of fiduciary duty.[123] The central question therefore is whether Greenberg knew that the acts it assisted were breaches of fiduciary duty.[124]

Courts applying Texas law (and assuming the cause of action does exist) have found the requisite knowledge when the plaintiff alleged that legal counsel had adequate information because of the context in which those actions were taken.[125] In *Janvey v. Proskauer Rose, LLP*, counsel was hired to help the fiduciary deal with an SEC investigation.[126] The district court found sufficient the allegation that counsel knew the fiduciary "was offering unrealistic rates . . . that supported the SEC's belief [that the fiduciary] was operating a fraudulent scheme" to infer that counsel knew that its client was committing fraud.[127] In *Official Stanford Investors Committee v. Greenberg Traurig, LLP*, counsel provided legal services to a fiduciary that ran a Ponzi scheme.[128] The court found that deficient legal services were provided because counsel continued to render services to the client despite "red flags" such as accusations of violations of U.S. banking laws, the client's goal of evading U.S. regulation, and knowledge that the client operated from the U.S.[129] The plaintiff alleged that counsel helped the client evade U.S.

---

[122] *Compare RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015), *with Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).

[123] Greenberg Traurig, LLP's Mem. In Support of Mot. to Dismiss the Trustee's Second Am. Compl. 9-10, ECF No. 85.

[124] *Juhl v. Airington*, 936 S.W.2d 644 (Tex. 1996) (internal citation omitted); *see also* [124] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2016).

[125] *See generally Janvey v. Proskauer Rose, LLP*, No. 3:13-CV-0477-N, 2015 WL 11121540 (N.D. Tex. June 23, 2016); *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881 (N.D. Tex. Dec. 17, 2014).

[126] *Janvey*, 2015 WL 11121540, at *1.

[127] *Id.* at *5-*7.

[128] *Official Stanford Inv'rs Comm.*, 2014 WL 12572881, at *1.

[129] *Official Stanford Inv'rs Comm.*, 2014 WL 12572881, at *3.

18

regulations, "skirting Panamanian and Venezuelan regulators, making private equity and venture capital investments using CD proceeds without disclosing the investments to CD investors, and structuring real estate deals using CD proceeds without disclosing the deals to CD investors."[130] The court found that allegations of counsel's willing assistance in the operations of the client's company coupled with counsel's knowledge of financial corruption in the base of client's operations were enough to infer knowledge of breaches of fiduciary duty.[131]

### 3. The Complaint Does Not Sufficiently Allege Aiding and Abetting under Either Delaware or Texas Law

The most specific factual allegations about Greenberg are in the aiding and abetting portion of the Complaint.[132] In his attempt to establish aiding and abetting on Greenberg's part, the Trustee says this:

> 170. Greenberg knowingly participated in Salamone's and Halder's breaches of fiduciary duties to Westech and Tejas in connection with the execution of the Cancellation Agreement. Greenberg drafted, *sua sponte*, and encouraged both Salamone and Halder to execute the Cancellation Agreement, which terminated Halder's restrictive covenants and admitted liability by Westech for certain Accrued Obligations to Halder. Thus, Greenberg knowingly participated in Salamone's and Halder's breaches of fiduciary duty and collusive misconduct.

> 171. In particular, Greenberg drafted the Cancellation Agreement knowing that: (a) Westech was not in material breach of its financial obligations to Halder; (b) Halder would have been entitled to only $180,000 in severance payments if the parties chose not to renew the Halder Employment Agreement; (c) Halder had not undertaken the conditions precedent to be entitled to payment of any Accrued Obligations; (d) the Cancellation Agreement was void because Salamone had no authority to execute the Cancellation Agreement; and (e) the Status Quo Order prohibited the Cancellation Agreement. Greenberg cannot credibly deny knowledge of (a)

---

[130] *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *3 (N.D. Tex. Dec. 17, 2014) (internal citations omitted).

[131] *Id.* at *9.

[132] There are some factual allegations in the breach of fiduciary duty count, but that count has been dismissed for the reasons stated above. *See supra* Section II.A.

through (e) because a Greenberg attorney drafted the Halder Employment Agreement.[133]

The last sentence in paragraph 171 is most curious. It seems to say that the Trustee is inferring, and would have the Court infer, the knowledge specified in paragraph 171 subsections (a) through (e) based solely on the fact that Greenberg drafted the Halder Employment Agreement. But the events described in (a) through (e) occurred long after Greenberg drafted the Halder Employment Agreement and so the inference is unfounded. That said, the factual recitations in (a) through (e) are not tied to the sentence that follows, and so must be treated as the allegations of the Trustee. But the matters in those recitations are not matters that Greenberg could have plausibly "known."

First, Greenberg could not have "known" that the cancellation agreement was prohibited by the first status quo order as alleged in paragraph 171(e). The status quo order prohibits payments and transfers outside the ordinary course, but prohibits only agreements "with respect to a merger, tender offer, restructuring or a recapitalization,"[134] which are in a far different class than an agreement related to the contract of even a key employee. The Trustee's argument that the cancellation agreement was a "transfer" of a "property right" prohibited by paragraph 2e of the status quo order may have some purchase, but these are far from clear cut determinations, and certainly not something even a sophisticated law firm could "know."[135]

Second, and for similar reasons, Greenberg could not have "known" that Salamone had no authority to enter into the cancellation agreement as alleged in paragraph 171(d). The Halder

---

[133] Third Am. Compl. ¶¶170-71, ECF No. 97.
[134] Third Am. Compl., Ex. E at 3, ECF No. 97.
[135] *See Iotex Commc'ns, Inc. v. Defries*, No. 14518, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) ("where pleading a claim of . . . breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it.").

20

employment agreement provides that only the board had the authority to "terminate" Halder's employment,[136] and the bylaws gave a majority of the board the right to "remove either for or without cause" an officer elected or appointed by the board.[137] A sound argument can be made that either a "removal" or a "termination" is a unilateral decision by the board to oust an employee or officer, and not the same type of action as the mutual act of entering into the cancellation agreement. So it is not at all clear that Salamone lacked the authority to enter into the cancellation agreement, and this is therefore not something that Greenberg could "know."[138]

Of course the Delaware Chancery Court had just handed down a decision that split the board. To be sure, it would have been best to seek approval for the cancellation agreement from the Delaware Chancery Court, but this would have been Westech's decision, and not Greenberg's. In any event, Gorman's attorneys did bring the issue to the attention of the Delaware Chancery Court, but that court made no decision.

Third, the Complaint does not allege that Halder competed or solicited employees until after his resignation. At one point in the Complaint, the Trustee asserts that Halder "at the time of th[e] Cancellation Agreement, already determined to compete with the Company,"[139] but planning to compete would not have violated the covenants as alleged in paragraph 171(c). As a result, there was nothing for Greenberg to "know" then.

Finally, whether Westech was not in breach of its material financial obligations to Halder, and whether Halder would have been entitled only to $180,000 of severance obligations as alleged in paragraph 171 subsections (a) and (b) are facts that Greenberg could plausibly have

---

[136] Third Am. Compl., Ex. B at 1, ECF No. 97.
[137] Third Am. Compl. ¶19, ECF No. 97.
[138] *See Iotex Commc'ns, Inc. v. Defries*, No. 14518, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) ("where pleading a claim of . . . breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it.").
[139] Third Am. Compl. ¶45, ECF No. 97.

"known."[140] The Trustee alleges that Halder was overpaid by $279,000[141] and that the net debt to Halder could have been repaid with proceeds from the sale of a building in November 2014.[142] Even so, in order for these facts to establish a plausible claim of aiding and abetting on the part of Greenberg, Greenberg would also need to have "known" that the severance obligations could have easily been satisfied from the overpayment to Halder and sale of the office building. Yet this knowledge on the part of Greenberg has not been alleged.[143]

For all these reasons, the Trustee has not alleged a plausible aiding and abetting claim.

### D.  Disgorgement and equitable subordination

The Trustee has asked for disgorgement of Greenberg's fees[144] and equitable subordination of Greenberg's claim.[145] Both are remedies and are available only if the Court finds inequitable conduct, or other conduct justifying the remedies.[146] As no inequitable conduct

---

[140] Related to these allegations, the Trustee alleges elsewhere in the Complaint that Halder had been overpaid $279,000, meaning Westech would have owed Halder nothing if it chose not to renew Halder's employment agreement. Third Am. Compl. ¶84, ECF No. 97. But the Trustee overlooks the fact that under the Halder's employment agreement, if the agreement was not renewed, Halder would have also been entitled to a year of Quarterly Bonus Payments of at least $75,000 ($300,000 for the year, even without Company action) and insurance benefits. Third Am. Compl. ¶¶78-79; Third Am. Compl., Ex. B, §§ 4(b), 6(c). Assuming that the cost of insurance is a nominal amount and that the Trustee's allegation about the overpayment is true, non-renewal meant that Westech would have been liable for at least $201,000.

[141] Third Am. Compl. ¶¶81, 84, ECF No. 97.

[142] Third Am. Compl. ¶89, ECF No. 97.

[143] Unlike the accountants in *In re MuniVest Services, LLC*, it would not be reasonable to infer to Greenberg knowledge of the intricate financial details of Halder's employment relationship with Westech, as opposed to knowledge of the legal details, which can and should be inferred. *Kohut v. Metzler Locricchio Serra & Company, P.C. (In re Munivest Services, LLC)*, 500 B.R. 487, 505 (Bankr. E.D. Mich. 2013).

[144] Third Am. Compl. ¶¶177-79, ECF No. 97.

[145] Third Am. Compl. ¶¶216-26, ECF No. 97.

[146] The Fifth Circuit test for equitable subordination requires a finding of inequitable conduct. *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464-65 (5th Cir. 1991). The Trustee acknowledges that both are remedies that are premised on his attempt to state a claim for breach of fiduciary duty. Pl.'s Answering Br. in Opp. To Greenberg Traurig, LLP's Mot. to Dismiss the Trustee's Second Am. Compl. 16, 19-20, ECF No. 98.

has been adequately plead, the counts requesting disgorgement of fees paid to Greenberg and equitable subordination of Greenberg's claim are dismissed.

### III.  <u>CONCLUSION</u>

For the reasons discussed above, Greenberg Traurig, LLP's motion to dismiss will be granted.